# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 8, 2003 Session

## BARBARA LEE BUNCE KERCE v. STEPHEN PAUL KERCE

**Appeal from the Circuit Court for Moore County**
**No. 667     Lee Russell, Judge**

---

**No. M2002-01744-COA-R3-CV - Filed August 29, 2003**

---

The appellant Stephen Paul Kerce challenges the divorce decree entered in Moore County Circuit Court, alleging that the court erred in its valuation and distribution of the marital estate. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., J., and PATRICIA J. COTTRELL, J., joined.

Paul A. Flowers, Nashville, Tennessee, for the appellant, Stephen Paul Kerce.

R. Whitney Stevens, Jr., Fayetteville, Tennessee, for the appellee, Barbara Lee Bunce Kerce.

## OPINION

The parties, Barbara Lee Bunce Kerce, and Stephen Paul Kerce, were married on July 4, 1988. At that time, Barbara Kerce was working as president of Adler's Foreign Books. A year later in July of 1999 the parties relocated to Huntsville and formed International Book Import Service, Inc. (IBIS). Mrs. Kerce was the chief officer and manager of the daily operations of the business; Mr. Kerce worked as a computer consultant for IBIS. In 1997, the couple relocated to a 271-acre farm in Moore County, Tennessee. In 1998, IBIS relocated to a 10,500-square-foot commercial building in Lynchburg, Tennessee. On December 22, 2000, the wife filed her Complaint seeking divorce on the grounds of adultery, inappropriate marital conduct, and as an alternative, irreconcilable differences. The husband stipulated to the adultery ground. On February 6, 2002, the court heard proof primarily on the value and proposed distribution of IBIS and the extensive realty holdings of the marriage. Expert and lay testimony concerning IBIS varied greatly, such that the resulting business valuation ranged anywhere from $90,000 in value to $1,013,028 in value. The parties testified as to the value of the real estate and the proposed division of that realty. In addition to this lay proof, the wife presented the testimony of real estate appraiser Joe Smith.

With regard not only to the value of IBIS, but also to the value of the marital estate and the attendant real property, the trial court heard from three experts as well as lay proof offered by the parties themselves and one Christiane Frederickson. Of specific interest regarding Mr. Kerce's issues on appeal are the expert opinions proffered by Don Carpenter, CPA on behalf of Barbara Kerce and the expert proof of Gregory Luna, CPA on behalf of Stephen Kerce. Mr. Carpenter testified without objection to the following methodology employed in evaluating IBIS on behalf of the appellant Wife:

> Q. What method of evaluating closely held businesses are generally used?
>
> A. Well, there is quite a number depending on the circumstances, but I would say that in general, either you value a stream of earnings going forward and then discount them back using a factor that takes in account all the risk, inflation, and so forth, or you value the assets of the business as if those assets were going to be sold. There can be some inclusion of both methods in limited cases, but normally it is one or the other.
>
> Q. Am I following you correctly in that you would not generally in a closely held business evaluate assets as well as the income stream?
>
> A. Not typically. There are exceptions to that rule. For example, if a business had purchased a piece of land in the past and that land had – the business was still an ongoing business so you would look at the earnings, but the land had just mushroomed in value where it is way out of line with what the business needed. We really don't have that in this case, or if the business had bought a stock with some of its free cash and that stock had soared in value, you might have to look at that asset individually.

Mr. Carpenter testified that he viewed the space rented by IBIS from the parties, the nature of the business as a German textbook distributor, the immense responsibilities and market significance of Mrs. Kerce's contributions to the business, the significant contributions of Mr. Kerce in the computerization of the business, and the attendant salaries to be paid to the parties by the business as part of its ongoing liabilities. In evaluating this closely held corporation Mr. Carpenter investigated the current stream of earnings, discounted the value of uncollectible debt and obsolete inventory and attempted to account for the particular risks attendant to the German textbook business, including the need for continued contributions of expertise on par with those made by the parties, increased competition and changes ongoing in the market for German books resulting from changes in German spelling and the economic unification of Europe. This evaluation culminated in a $90,000 market value.

For his part Mr. Kerce presented the expert testimony of Mr. Luna. Of particular import in the description of Mr. Luna's methodology is the following dialog:

> Q. Now could you tell us what all you considered and what methods you decided to employ?

A.	We used a method that is known as the Delaware block method. IT looks at three basic factors. It looks at market value of the company, the value of the assets, and the value of the earning stream of the business based on history. It's a method that is prescribed by the IRS for estate valuations. We have used it numerous times in these types of cases and these types of valuations.

Q.	Now with regard to IBIS, Mr. Luna, knowing we are operating under the Delaware block method, how did you determine the market value of IBIS?

A.	Well, in this case, it's a closely held corporation. There is no – it is not traded, so there is no market value you can look at. A market value would be such as a traded stock, and you can go to an exchange and get a price. In this case, as far as I know, there has never been any trading of the securities, so you give a zero weight to the market value.

Q.	Okay. Now as to the valuation of assets, which is the second prong of the Delaware block method, how did you come up with that with IBIS?

A.	We took – again, we took the December 31, 2000, numbers. We requested the 2001 numbers, but we could not get those. I believe they said basically they wouldn't be ready until the end of February, so we took the 2000 – December 2000 numbers. We took their balance sheet numbers. We made adjustments that we would consider necessary to make them then conform with general accepted accounting principles, and I have a schedule in here of how we adjusted that. . . .

Mr. Luna testified that he had not personally viewed the business location, he was not aware of the intricacies of the German book distributing business, had relied on information provided by the husband that the obsolete inventory was overestimated, that Mrs. Kerce's salary was likewise inflated, and that the business had significant intrinsic value outside of the abundantly broad responsibility and duties exercised by Mrs. Kerce. His evaluation, which extended the earnings of the business over a period of five years, extended loss of obsolete inventory over eight years, and its estimated 15% pre-tax return on the business resulted in $1,013,028 value.

It bears noting that although Mr. Luna's methodology has been adopted by our Supreme Court for the purpose of assessing the fair value of a dissenter's shares in a closely held corporation, it is by no means the only acceptable method, and for the purposes of evaluating the entire business as a marital asset is not a snug fit under the circumstances. *See Blasingame v. American Materials*, 654 S.W.2d 659, 666-67 (Tenn.1983). As a buttressing argument, Mr. Kerce urges that Carpenter's method does not even fit within the rule this Court articulated in *Wallace, supra.* We find that the following language from *Wallace* undermines the Mr. Kerce's argument and illustrates the problem facing the trial court:

> Determining the value of a closely held corporation is not an exact science. *In re Marriage of Mullins*, 121 Ill.App.3d 86, 76 Ill.Dec. 560, 562, 458 N.E.2d 1360, 1362 (1984). The courts have not articulated a consistent approach to the valuation of this type of marital asset. However, Rev.Rul. 59-60, 1959-1 C.B. 237 has been recognized as providing the most comprehensive guide to making this determination.

B. Goldberg, *Valuation of Divorce Assets* §§ 1.12 & 6.6 (1984) and 24 Am.Jur.2d *Divorce and Separation* § 947 (1983). But Rev.Rul. 59-60 is intended to be only a guide. It was never intended to be an inflexible rule. *Turgeon v. Turgeon*, 190 Conn. 269, 460 A.2d 1260, 1265 (1983).

Rev.Rul. 59-60 contains nine factors which should be considered when determining a closely held corporation's value. These factors include:

> (1)  the nature of the business, including its history since organization,
> (2)  the economic status of the industry and the nation at the critical date of valuation,
> (3)  book value,
> (4)  earnings,
> (5)  dividends and dividend paying capacity,
> (6)  the existence or lack of good will or other intangible value,
> (7)  sales of the stock and the size of the block to be valued,
> (8)  the selling price of comparable securities relative to their earnings, dividends and asset values,
> (9)  the life insurance proceeds received by a corporate beneficiary on a policy covering the sole or controlling stockholder.

*Wallace*, 733 S.W.2d, at 107-8.

In challenging the trial court's determination as to the value of the marital assets, Mr. Kerce argues that inasmuch as Mrs. Kerce's expert failed to apply either the "Delaware Block Method" or the valuation method cited by this Court in *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn.Ct.App.1987), that that expert's opinion should have been disqualified. The net effect of Mr. Kerce's argument is that the only estimation therefore of IBIS's value would be that of his expert. Thus, Appellant argues that the court's valuation was against the weight of the evidence.

Mr. Kerce's argument fails to consider first the general rule that the valuation and distribution of marital estates are questions of fact which come to this Court with a presumption of correctness pursuant to Tennessee Rule of Appellate Procedure 13(d), *Kinard v. Kinard*, 986 S.W.2d 220, 230-31 (Tenn.Ct.App.1998); and second that the determination as to the methodology used by an expert in evaluating the estate is a question resting within the sound discretion of the trial court. *Id. See Wallace, supra*,; *see also Wright v. Quillen*, 909 S.W.2d 804, 809 (Tenn.Ct.App.1995). In considering the propriety of an expert's methodology, this Court has stated:

> As to Mr. Miller's methodology, we have said that determining the value of a closely held corporation is not an exact science, and the courts have not articulated a consistent approach to the problem. *Wallace v. Wallace*, 733 S.W.2d 102 (Tenn.App.1987). Two recognized approaches are the "Delaware Block Method,"

*see Blasingame v. American Materials, Inc.*, 654 S.W.2d 659 (Tenn.1983) and the method described in Revenue Ruling 59-60, 1959-1 C.B. 237. *See Wallace v. Wallace*, 733 S.W.2d 102 (Tenn.App.1987). Mr. Miller did not follow with of these methods. In fact, he disclaimed any knowledge of either approach.

   . . . .

   While Mr. Miller disclaimed any knowledge of Revenue Rule 59-60, some of the factors he considers important also appear in that publication; i.e. the nature of the business; the economic status of the industry; earnings; the existence or lack of good will or other intangible value; the selling price of comparable securities relative to their earnings, dividends, and asset values. In this state where "[T]he choice of the proper method or combination of methods (to determine value) depends upon the unique circumstances of each corporation." *Wallace v. Wallace*, 733 S.W.2d at 107 (Tenn.App.1987), we think Mr. Miller's methods form a basis "reliable enough to assist the jury to reach an accurate result." *State v. Ballard*, 855 S.W.2d at 562 (Tenn.1993).

*Wright*, 909 S.W.2d, at 809-10.

   Of overriding significance in the evaluation of IBIS is the degree to which the success of the business depends on Ms. Barbara Kerce. From the inception of the business in 1989, she has been the dominant figure in the every day operations of the business and has devoted her full-time energies to building the business. These are highly educated people. Mr. Kerce has a Bachelor's Degree in English literature from the University of California; a Master's Degree in comparative literature from the University of Chicago; a PHD in comparative literature from the University of Chicago, and was a Fullbright Fellow at Gennaidon Library. He has had full-time employment in Huntsville, Alabama as a computer software program manager since 1989. Mrs. Kerce has a Bachelor's Degree in German literature from the University of Wisconsin.

   While the contributions of Mr. Kerce to IBIS cannot be relegated to insignificance as Mrs. Kerce would have it the proof shows as asserted by the witness, Christiane Frederickson "when you ask around, when you ask German teachers, they will actually call Barbara IBIS."

   Further, as the trial judge stated: "She, as he has very graciously conceded, she is the major player in this, and she has been the one to make it what it is."

   In valuing a professional practice it has long been held that good will of the business, dependent as it is on the person and personality of the spouse practicing the profession, is not a part of the marital estate. *Smith v. Smith*, 709 S.W.2d 588 (Tenn.Ct.App.1985); *Hazard v. Hazard*, 833 S.W.2d 911 (Tenn.Ct.App.1991); *Enoch v. Enoch*, 1987 WL 12042 (Tenn.Ct.App.June 10, 1987).

   In *Alsup v. Alsup*, 1996 WL 411640 (Tenn.Ct.App.July 24, 1996) (no app. for perm. app. filed), the husband worked at Pirelli Armstrong Rubber Co. and the wife operated a daycare business

from the home of the parties known as "Ms. Judy's Playschool." Husband's expert testified that the fair market value of Ms. Judy's Playschool was $280,000 while the wife's expert testified that such value was $58,156.00. In accepting the wife's valuation the trial court held: "That the parties own all of the stock to the corporation known as and doing business under the name Ms. Judy's Playschool and that said stock is valued at $58,000 to $60,000. This value is based on: case law that makes it clear that this type of business has very little value without Mrs. Alsup working there. The court's finding that there is no good will or going concern of this business without Mrs. Alsup running it; that the business is a result of the individual efforts of the defendant;"

On appeal, this Court held:

> Husband's first contention on appeal is that the trial court erred in finding that Ms. Judy's had no good will value. At the outset, we note that the trial court did not find that Ms. Judy's had no good will value. Rather, the trial court held that Ms. Judy's had no good will without wife running the business. Therefore, we will treat the issue on appeal as whether the trial court erred in failing to include the good will value in its valuation of Ms. Judy's and its subsequent distribution of the marital estate.

> . . . .

> From the foregoing evidence, it is apparent that the good will of Ms. Judy's would be valueless without wife's presence. Therefore, the good will value of Ms. Judy's depends solely upon the reputation of Judy Alsup, as is true in the cases of professional practices and sole proprietorships. The fact that Ms. Judy's is a closely held corporation is of no moment under the circumstances of the present case because, for all practical purposes, Ms. Judy's was operated as a sole proprietorship. Accordingly, we hold that the good will value of Ms. Judy's is not a marital asset subject to distribution with the marital property.

In *Smith v. Smith*, 709 S.W.2d 588, 591-92 (Tenn.Ct.App.1985), this Court quoting from *Holbrook v. Holbrook*, 103 Wis.2d 327, 309 N.W.2d 343 (Wis.App.1981) stated:

> The concept of professional good will evanesces when one attempts to distinguish it from future earning capacity. Although a professional business's good reputation, which is essentially what its good will consists of, is certainly a thing of value, we do not believe that it bestows on those who have an ownership interest in the business, an actual, separate property interest. The reputation of a law firm or some other professional business is valuable to its individual owners to the extent that it assures continued substantial earnings in the future. It cannot be separately sold or pledged by the

-6-

individual owners. The good will or reputation of such a business accrues to the benefit of the owners only through increased salary.

. . . .

There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value.

309 N.W.2d at 354-55.

709 S.W.2d 588, 591-92 (Tenn.Ct.App.1985).

That the trial court recognized the future involuntary servitude inherent in basing marital asset value on such good will is evident during the testimony of the expert witness for Mr. Kerce:

THE COURT: You mentioned this is not a capital-intensive business. It is really a very personal business, right, and the major asset of the corporation is sitting over there to my left; right?

THE WITNESS: Right.

THE COURT: If she dies tomorrow, this corporation is not worth $1 million or 450; right?

THE WITNESS: Well, I don't know if you can sell it to somebody else. I mean, they could provide those same services. That is a possibility.

THE COURT: Really, your million dollar valuation is - - really what you are saying is that is what it's worth in her hands. That's not what it is worth in anybody else's hands; right?

THE WITNESS: Well, that is probably correct.

In keeping with its previous observation that the contributions of Mr. Kerce to IBIS were not insubstantial, the court did not fully accept the valuation of $90,000 offered by Mrs. Kerce but rather determined the value of IBIS to be $220,000.

Appellant would argue that there is an exclusive list of methods to be used in evaluating the assets of the marital estate; this assertion is contrary to the well settled rule within this jurisdiction. Under the circumstances, given the expert testimony presented to the court and the range of value created by that testimony, the consideration of the proof as presented by Ms. Kerce's expert, Donald H. Carpenter, CPA, does not amount to an abuse of discretion; as a result considering the value as presented in that report as a lower bound, this Court does not find that the evidence preponderates against the valuation of IBIS at $220,000. Considering the record as a whole accompanied with the appropriate presumptions, we hold that the trial court did not abuse its discretion in considering Mr. Carpenter's opinion, and that the evidence does not preponderate against the court's assignment of value.

Mr. Kerce's second issue on appeal concerns various alleged errors in the distribution of the marital estate. In particular, Mr. Kerce argues that the court failed to recognize the value of Barbara Kerce's substantial separate property, failed to consider the tax consequences to each party and economic circumstances of each party, and failed to distribute all marital assets. Concerning the statutory factors involved in the equitable distribution of marital assets, Tennessee Code Annotated section 36-4-121 provides the following pertinent guidance:

(c)  In making equitable division of marital property, the court shall consider all relevant factors including:
(1)     The duration of the marriage;
(2)     The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;
(3)     The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;
(4)     The relative ability of each party for future acquisitions of capital assets and income;
(5)     The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution fo a party as homemaker or wage earner to b given the same weight if each party has fulfilled its role;
(6)     The value of the separate property of each party;
(7)     The estate of each party at the time of the marriage;
(8)     The economic circumstances of each party at the time the division of property is to become effective;
(9)     The tax consequences to each party; and
(10)    Such other factors as are necessary to consider the equities between the parties.

As stated above, the predominance of proof taken at trial concerned the value of IBIS and the extensive real property holdings of the parties, with both parties indicating that the remainder of the estate could be distributed by agreement. Each party had submitted to the court its proposed distribution of the marital estate. Between the date of hearing, February 6, 2002, and the date of entry of the decree, June 26, 2002, the Husband filed two motions. The first of these motions concerned the decision of the tax liabilities of the parties and was filed on April 23, 2002. The second motion requested the sale of certain real property and was filed on June 5, 2002. In its decree the trial court included the following paragraphs:

VII.

The plaintiff is awarded her separate property consisting of an inheritance received or to be received from her parents, reference accounts:
Fidelity Ultra Service Account #YO4-112577
Fidelity Roth IRA account #109-468860

Fidelity Income Advantage Annuity account#600100448
furniture and personal effects of parents in storage

VIII.

The defendant is awarded his 1984 VW Rabbit as his separate property.

IX.

Each party will file separate income tax returns for the years 2001 and 2002 and will provide to the other party all necessary information on income and expenses for both years to facilitate such filing or the amendment of returns heretofore filed. This information shall include all income and expenses of the parties from IBIS and the income and expenses of the farm up to February 6, 2002 and this information shall be provided with in 30 days after entry of this decree.

X.

The parties shall execute quitclaim deeds to accomplish the award of real estate in accordance with this decree. They shall also execute any bill of sale, vehicle title, stock certificate or the evidence of ownership as may be necessary to facilitate the provisions of this decree. All such execution and transfer of documents under this paragraph shall be accomplished within 30 days of the entry of this decree.

Keeping in mind the broad discretion accorded to the trial court in the equitable division of property, this Court finds that the trial court exercised its discretion properly. The appeal therefore is denied. The decision of the trial court is affirmed in all respects and the cause is remanded for such further proceedings as is necessary. Costs are assessed against the appellant, Stephen Paul Kerce, for which execution may issue.

_____
WILLIAM B. CAIN, JUDGE