IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 2, 2003 Session

## MYRTLE MARIE STAGNER v. LLOYD OTIS STAGNER

**Appeal from the Chancery Court for Jefferson County**
**No. 02-157     Telford E. Forgety, Chancellor**

**FILED FEBRUARY 27, 2004**

**No. E2003-00610-COA-R3-CV**

---

After nineteen years of marriage, Myrtle Marie Stagner ("Wife") sued Lloyd Otis Stagner ("Husband") for divorce. After trial, the Trial Court ordered, *inter alia*, the marital home sold and awarded Wife sixty percent of the proceeds with ten percent being alimony in solido in lieu of any other alimony. The Trial Court also characterized as Husband's separate property the appreciation of Husband's separate pre-marital property. Wife appeals as to both the alimony and the property division. We affirm, in part, and vacate, in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, in part; and Vacated, in part; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., joined and CHARLES D. SUSANO, JR., J., joined in a separate concurring opinion.

Douglas R. Beier, Morristown, Tennessee, for the Appellant, Myrtle Marie Stagner.

P. Richard Talley, Dandridge, Tennessee, for the Appellee, Lloyd Otis Stagner.

### OPINION

### Background

After nineteen years of marriage, Wife filed for divorce in August of 2002. At the time of trial, Wife was 73 years old and Husband was 82 years old. Both had been married previously and divorced. Wife claims Husband asked her to file for a divorce. She also claims "he started running around with another woman." The case was tried in January of 2003.

Husband denies Wife's allegations of infidelity. Husband states he has been faithful to Wife throughout the entire marriage. Husband claims Wife got mad about a trip he took to the Veteran's Administration Hospital in Johnson City because another woman, Lucille Higgs, accompanied him on this trip, and Wife has stayed mad ever since. Husband states:

I told her . . she said do you want me to get a divorce and I said yes go ahead and get it. And that's exactly the words. I was under stress. And I . . I just couldn't handle it anymore.

We was disagreeable and we . . she . . I couldn't never talk to her right. I mean . . we couldn't sit down and talk anymore. So . . she was on me all the time. She said I had committed adultery when I took Lucy up there with me and Lucille and what happened she was on there all the time.

She said you committed adultery, you've lied, you cheated and everything which I didn't. I said get off of it. I've had enough.

Wife has worked outside the home for about a total of seven years of her adult life holding jobs such as a bookkeeper, waitress, and physical therapist. When she met Husband, she was working as a live-in caretaker for a woman who had suffered a stroke. Wife has not worked outside the home since the parties married. Wife claims Husband told her he did not want her to work because he wanted to travel. Wife told Husband she had no money and he told her he had money to take care of them both. Wife states she has relied completely upon Husband's income and support since they were married.

Husband was retired when the parties met. At that time, he owned a 327 acre farm in Illinois. Husband also had an IRA, bank stock, and oil stock prior to the marriage. Husband claims Wife made no contribution to these assets. After the parties met, Husband did not work but drew a salary of approximately $200 per month for being a director of a bank, a position he held for thirteen years.

After they married, the parties lived in Husband's farm house in Illinois and traveled making trips to several places including Florida, Texas, and Alaska. Approximately twelve years ago, they moved to Tennessee. They built the home they lived in at the time of the separation. The parties agreed to an appraised value of this home of $245,000. Wife was residing in the marital home at the time of trial and Husband was renting an apartment.

Husband handled the parties' finances. Wife states "he told me that it was his money. It did not belong to me; I had no money. It was his money. He kept a roof over my head and food in my mouth." Wife's sole source of income is $405 from Social Security. During the marriage, Wife's $405 would go into the joint checking account. Husband would give Wife approximately $600 per month to add to this $405 to run the household, buy clothes, etc. Wife stated that at times Husband would get mad at her and take the money away. Since the parties separated, Husband continued to give Wife $600 per month voluntarily up till the date of the divorce. While they were married, Husband would give himself an additional $300 per month and put everything else into the bank. Husband claims "we spent every dime that we made . . . ." Husband receives $845 per month in Social Security. He also receives income from the rental of his farm, the rental of his farm house, and oil royalties. Husband states the parties have two joint bank accounts, one with a little over

$11,000 in it and one with a little over $7,000. Husband also has a separate checking account. Wife also has approximately $6,000 in a bank in Jefferson City. The parties have very little debt.

During the marriage, Wife acquired some Wal-Mart stock in an IRA with a current value of approximately $20,000. Wife sold the vehicle she owned when the parties met because Husband told her they "didn't need that many vehicles." She recently purchased a 1992 Buick Roadmaster, which she estimates is worth approximately $4,000. Wife also had quite a bit of jewelry prior to the marriage and Husband purchased additional jewelry for her as gifts during the marriage. Wife also has a collection of beanie babies. When questioned regarding the value of the furnishings in the marital home, Wife stated "[i]t would be yard sale stuff. Everything in the house . . . . It would all be yard sale stuff because it's all old, me and him been married almost 20 year and it's been there ever since I've been there. All but the bedroom suite, the dining room table." The parties also own several vehicles, a bass boat, an RV, some antiques, and two mobile homes, which are being used by relatives.

The value of Husband's IRA increased from approximately $60,000 pre-marriage, to approximately $112,00 at the time of trial. In addition, Husband owned 1,000 shares of Crawford County Bank prior to the marriage. Husband now owns 4,000 shares of THFF, the successor to Crawford County Bank. Husband estimates that the current value of the Illinois farm he owned pre-marriage is approximately $500,000. He also admitted that the farm has increased in value between 1983, when the parties married, and the time of trial. During the marriage, Husband used money from their joint accounts to pay real estate taxes, insurance premiums, repairs, and maintenance on the farm. Husband also used joint money to pay a plan fee for his IRA.

Both parties claim their health is not good. Wife states she has "colitis, nervous stomach," a problem with her kidneys, and allergies. Husband had cancer three times previously and has it again. He is going through testing and monitoring and states his doctor told him he has a 95% chance of having lung cancer. Husband also has artificial knees, high blood pressure, and heart trouble.

After trial, the Trial Court issued a memorandum opinion from the bench which was later incorporated into the Trial Court's March 3, 2003, judgment. The Trial Court granted Wife a divorce and found, *inter alia*, and as relevant to the issues on appeal, that Husband's THFF stock, the Illinois farm, Husband's IRA, and a U.S. Bank account, including their appreciation, were Husband's separate property. The Trial Court awarded to Wife her IRA, her funds held by U.S. Bank, the 1992 Buick, her jewelry, and the beanie baby collection, as Wife's separate property. The Trial Court found that Husband "has an ability to pay" alimony. However, the Trial Court also found that given Wife's life expectancy, she would not "use up what she gets . . ." in the property division. The Trial Court ordered the marital home sold and the proceeds divided sixty percent to Wife and forty percent to Husband. The Trial Court stated "[t]he additional ten (10) percent to the Wife, Myrtle Marie Stagner, is awarded as alimony in solido in lieu of any other alimony." Wife appeals to this Court.

**Discussion**

Although not stated exactly as such, Wife raises two issues on appeal: 1) whether the Trial Court erred in failing to grant Wife alimony in futuro; and 2) whether the Trial Court erred in failing to characterize as marital property the appreciation of Husband's separate assets.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Determinations concerning the amount and duration of alimony are factually driven and require a balancing of the various factors contained in Tenn. Code Ann. § 36-5-101(d)(1). *Herrera v. Herrera*, 944 S.W.2d 379, 387-88 (Tenn. Ct. App. 1996). Our legislature specifically provided:

It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony. In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

-4-

(E)  The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F)  The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G)  The separate assets of each party, both real and personal, tangible and intangible;

(H)  The provisions made with regard to the marital property as defined in § 36-4-121;

(I)  The standard of living of the parties established during the marriage;

(J)  The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K)  The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L)  Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1) (2001).[1]  Furthermore, while a trial court must consider all relevant statutory factors to determine if an economically disadvantaged spouse can be rehabilitated, the most important statutory factors are the disadvantaged spouse's need and the other spouse's ability to pay.  *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001); *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002).

After carefully reviewing the record in light of the statutory criteria listed above, we hold the Trial Court erred in failing to award Wife long-term alimony.  It is undisputed that Wife cannot be "rehabilitated."  However, the Trial Court found Wife did not have a need for long-term alimony.  The evidence preponderates against this finding.  The evidence shows Wife is 73 years old with little work history, and has not worked outside the parties' home for nearly twenty years.  Her sole source of income is $405 from Social Security.  In addition, Wife has "colitis, nervous

---

[1]The version of Tenn. Code Ann § 36-5-101(d)(1) applied and cited above now has been amended, but this amendment is not applicable to this divorce.

stomach," a problem with her kidneys, and allergies. The Trial Court's assumption that Wife would not live long enough to "use up" what she received in the property division is not supported by the record before us. While the Trial Court may be right in its assumption, it just as easily may be wrong. Wife clearly has a need for long-term alimony. In addition, the Trial Court found that Husband has the ability to pay long-term alimony. The evidence does not preponderate against this finding. Husband has significant assets after the divorce. Husband's income far exceeds Wife's. He is receiving $845 per month in Social Security as well as income from the rental of his farm, the rental of his farm house, and oil royalties. Additionally, the marriage was a long-term one to which Wife made contributions as a homemaker and the parties enjoyed a very good standard of living that allowed them to travel and acquire possessions such as a bass boat, an RV, mobile homes, and antiques. The evidence preponderates in favor of a finding that Wife both needs and is entitled to long-term alimony. We vacate that portion of the Trial Court's March 3, 2003, judgment that states "[t]he additional ten (10) percent to the Wife, Myrtle Marie Stagner, is awarded as alimony in solido in lieu of any other alimony" and we award Wife long-term alimony in the amount of $500 per month retroactive to March 3, 2003, the date of the divorce. Husband shall pay $750 per month for the first twenty-four months in order to make up the arrearages, with $500 of the $750 being the current monthly payment and $250 being credited toward the arrearages.

We next consider whether the Trial Court erred in failing to characterize as marital property the appreciation of Husband's separate assets. Courts must look to Tenn. Code Ann. § 36-4-121 when determining how to characterize and distribute property. In pertinent part, Tenn. Code Ann. § 36-4-121(b)(1) provides:

> (B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, . . . .
>
> * * *
>
> (D) As used in this subsection, "substantial contribution" may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine. . . .

Tenn. Code Ann. § 36-4-121(b)(1) (2003). A link is required between a spouse's contributions to the marriage and the appreciation of a separate asset before such appreciation may be considered marital property. *E.g., Langschmidt v. Langschmidt*, 81 S.W.3d 741, 746 (Tenn. 2002). Mortgage payments on separate property made out of a joint checking account containing marital funds have been held to be a sufficient link to convert the appreciation in equity in the separate property into marital property. *Cohen v. Cohen*, 937 S.W.2d 823, 833 (Tenn. 1996).

The Trial Court found Wife had not proven there had been appreciation to Husband's separate assets and, further, that Wife had not contributed substantially to any such appreciation. As to Husband's IRA, the shares of THFF, and the oil royalties, even if Wife proved any appreciation

of these assets, we agree with the Trial Court that Wife did not make a substantial contribution to any such appreciation. As to the Illinois farm, however, we disagree both with the finding that Wife did not make a substantial contribution to the appreciation of this asset and the finding that Wife had not proven any appreciation. Husband testified he used money from their joint accounts to pay real estate taxes, insurance premiums, repairs and maintenance on the farm. Since marital funds were used over the 19 years of the marriage to preserve this asset and allow it to increase in value, we find Wife did make a substantial contribution to the appreciation of the farm. We hold that the appreciation in value of the Illinois farm is marital property. In addition, Husband testified that the value of the farm has increased from 1983, when the parties married, to the time of trial. Since the only evidence in the record as to whether the farm appreciated in value is Husband's testimony that it did, the evidence preponderates in favor of a finding that the Illinois farm has appreciated in value. However, neither Husband nor Wife furnished any evidence as to the value of this appreciation. The parties are responsible for proposing the value of marital property, not the trial court. The value of a marital asset is determined by considering all relevant evidence regarding its value and the trial court is free to place a value on a marital asset within the range of evidence submitted. *See Koch v. Koch*, 874 S.W.2d 571, 577 (Tenn. Ct. App. 1993); *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987).

We remand this case to the Trial Court to value the appreciation of the Illinois farm and to distribute the marital property including this asset along with the other marital property. We do not mean to suggest that the Trial Court's distribution of the other marital property would have been incorrect if the Trial Court had been correct that the farm appreciation was not marital property. However, since we have held that the appreciation of the Illinois farm is marital property, this appreciation must be considered along with the other marital property in making an equitable distribution of the entire marital estate. We, therefore, vacate the Trial Court's distribution of marital property and remand it to the Trial Court to make an equitable distribution of the entire marital estate consistent with this Opinion. We affirm the remainder of the Trial Court's March 3, 2003, judgment.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and vacated, in part, and this cause is remanded to the Trial Court for further proceedings as required, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed one-half against the Appellant, Myrtle Marie Stagner, and her surety, and one-half against the Appellee, Lloyd Otis Stagner.

_____
D. MICHAEL SWINEY, JUDGE